UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re INVESTIGATIVE SUBPOENAS DIRECTED TOWARD CITIBANK, N.A. AND JPMORGAN CHASE BANK, N.A.<br><br>Issued by<br>COMMODITY FUTURES TRADING COMMISSION,<br>Three Lafayette Centre<br>1155 21st Street, N.W.<br>Washington, D.C. 20581,<br><br>Applicant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**FILED UNDER SEAL**<br><br>Miscellaneous No. |

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR *EX PARTE* ORDER TO DELAY NOTICE OF INVESTIGATIVE SUBPOENAS PURSUANT 12 U.S.C. § 3409

The Commodity Futures Trading Commission ("the Commission"), by and through the undersigned counsel, submits this memorandum of law in support of its Application for an *ex parte* order to delay notice of investigative subpoenas ("Application"), pursuant to 12 U.S.C. § 3409 (2012). The Application seeks an order delaying the notice that is required under the Right to Financial Privacy Act, 12 U.S.C. §§ 3401-3422 (2012) ("RFPA"), to a bank customer whose financial records the Commission seeks through investigative subpoenas ("Subpoenas"), attached herein. In support of its Application, based upon credible information and belief, the Commission states as follows:

## BACKGROUND

1.      The Commission is presently investigating Joshua Christian McDonald ("McDonald") for potential violations of the Commodity Exchange Act, 7 U.S.C. §§ 1-26 (2012)

(the "Act"), and the Commission Regulations ("Regulations") promulgated thereunder, 17

C.F.R. pts. 1-190 (2018), in connection with his activities trading foreign exchange ("forex").

      2.      The Commission has received credible information that, from at least August

2017 and continuing through today (the "Relevant Period"), McDonald, by and through his

company Perfection PR Firm LLC ("Perfection"), fraudulently solicited and/or received at least

$346,000 for the purported purpose of trading forex on behalf of at least seven investors.

McDonald's current residence is unknown.  Perfection is a Delaware-registered company with

no known primary place of business.  McDonald and Perfection have never been registered with

the Commission in any capacity.

      3.      According to information received by the Commission, McDonald induced an

investor ("Customer A") to invest $10,000 with McDonald through Customer A's company

("Company A") in August 2017.  At that time, McDonald resided in Glendale, California, a

suburb of Los Angeles, California.

      4.      While soliciting funds from Customer A, McDonald claimed to be an expert in

forex trading.  He also claimed to be extremely successful in his trading and showed Customer A

screenshots purporting to show his trading results.  Based on McDonald's representations,

Company A entered into a "Forex Investment Agreement" (the "Company A Agreement") with

Perfection on August 7, 2017.  Pursuant to the Company A Agreement, Company A agreed to

invest $10,000 with Perfection for a term of 30 days.  McDonald represented to Company A that

no more than 10% to 15% of Company A's investment would be at risk during any trading

session.  McDonald also represented that the "projected goal" for the investment was a

"minimum of 100% profit return on initial investment."

5.　　　Shortly after Company A's investment, on August 17, 2017, McDonald emailed an "update" to Customer A stating that Company A's $10,000 investment had earned a profit of $2,347 and attaching a screenshot purporting to be Company A's current account balance reflecting the sum of the initial investment and the profit.

6.　　　On September 7, 2017, McDonald sent an email to Customer A, with the subject "Final Overview" and attaching a document titled "[Company A] Final overview letter." The document stated that the investment by Company A suffered a "full loss" due to "unforeseen and uncontrollable market reactions."

7.　　　Shortly thereafter, McDonald changed his cellular telephone number, did not respond to emails from Customer A, and blocked Customer A from McDonald's social media accounts.  Upon information and belief, McDonald appears to have then left the Los Angeles area and moved to either Cleveland, Ohio or Loudon, Tennessee, a suburb of Knoxville, Tennessee, in order to evade Customer A's attempts to reach out to him.  Customer A attempted to initiate a civil lawsuit against McDonald, but has not succeeded in locating McDonald to effect service of process.

8.　　　McDonald employed similar fraudulent tactics with a second investor ("Customer B") in order to induce Customer B to invest with McDonald on behalf of her company ("Company B").  Customer B first became aware of McDonald in November 2017 through a family friend who had previously invested with McDonald.  Customer B negotiated and communicated with McDonald via email, telephone call, and videoconference, but never met McDonald in person.  During these discussions, McDonald promised Customer B that she would receive a 20% to 50% monthly return on her investment, with a maximum risk of only a 10% loss.  McDonald also falsely claimed that he had been trading forex for four years and had never

suffered a loss during that time.  In reality, just two months earlier, McDonald had purportedly lost all of the $10,000 invested by Customer A and Company A through trading.

9.      Relying on these misrepresentations, Customer B, the owner and sole proprietor of Company B, entered into a "Forex Investment Agreement" (the "Company B Agreement") with Perfection on behalf of Company B on January 9, 2018.  Pursuant to the Company B Agreement, Company B agreed to invest $100,000 with Perfection, which agreed to use the funds to trade forex.  McDonald promised returns of 20% on the investment per month, for a term of three months.  Under the Agreement, Perfection was entitled to 35% of each month's net profit, and Company B could request an accounting at any time during the term of the Agreement.

10.      On January 9, 2018, Company B transferred $90,000 to a Regions Bank account in Perfection's name and Perfection provided Company B with a "Paid Invoice" evidencing the payment.  Between January and April, 2018, Perfection provided two "Forex Earnings Report" at Customer B's request, claiming that the $90,000 investment had grown to $111,615.75.  In March 2018, Customer B attempted to withdraw some of the funds.  McDonald refused, citing the Company B Agreement's three-month investment term.

11.      After the Company B Agreement's three-month term expired, Customer B and Company B retained counsel and on April 19, 2018, sent a demand letter to Perfection for the immediate return of Company B's investment and a full accounting.  After failing to respond for several weeks, on May 4, 2018, McDonald sent an email to Company B, stating that Perfection refused to return Company B's investment because the Company B Agreement had called for a $100,000 investment from Company B, Company B had invested only $90,000, and Company B was therefore in breach of the Agreement.  McDonald stated that Company B's investment

4

would be released only if "the original investment amount was honored" and another $10,000

was invested. To date, Perfection and McDonald have not returned any funds to Company B.

12.     A third investor ("Customer C") was introduced to McDonald by a mutual

acquaintance. Prior to investing, Customer C spoke on the telephone with McDonald regarding

the latter's trading expertise and skill. McDonald falsely assured Customer C that, at any given

point, only 2% to 4% of his investment would be at risk, and that the expected monthly rate of

return for his investment was between 10% to 50%. McDonald also sent Customer C

screenshots purporting to be his trading results, but they were in fact fabricated data.

13.     Relying on these misrepresentations, Customer C wired a total of $150,000 to

McDonald's personal banking account at Citibank, N.A. ("Citibank") between November 2017

and January 2018, for the purpose of trading forex.

14.     Customer C successfully withdrew $20,000 from his investment in March 2018.

In May 2018, however, Perfection notified Customer C that his remaining funds had suffered a

total loss due to "some things that cannot be controlled or seen coming."

15.     The Commission has identified at least four additional persons who each invested

between $10,000 and $51,000 in Perfection's "Forex Investment Program" for a total of at least

$346,000 (including the investments of Customers A, B, and C).

16.     The Commission issued a request pursuant to its authority under Section 4g of the

Act, 7 U.S.C. § 6g(a) (2012), to all registered futures commission merchants ("FCMs") seeking

copies of all reports, books, and records related to McDonald and Perfection. The Commission

received a positive response from only one FCM — GAIN Capital — with which McDonald had

three forex trading accounts, two in his own name opened in May 2017, and one in the name of

Perfection opened in December 2017. After thorough investigation, the Commission has

discovered no other trading account in McDonald's or Perfection's name, despite McDonald's claim that he had been successfully trading forex for four years.

17.     The trading records from GAIN Capital show that McDonald did not deposit all of the $346,000 he collected from investors into the trading accounts under his or Perfection's name. Between August 2017 and March 2018, McDonald wired or deposited approximately $119,110 from his personal bank account at Citibank into one of his personal trading accounts at GAIN Capital.[1]  After withdrawing or transferring approximately $29,350 out of the account, and earning approximately $10,648 through trading, on March 6, 2018, McDonald withdrew the remainder of the balance, or $106,652, transferred the funds to his personal account at Citibank, and ceased trading.

18.     In January and February, 2018, McDonald wired or deposited a total of $150,000 from Perfection's corporate bank account at Regions Bank into the corporate trading account under Perfection's name.  In those two months, the account lost approximately $44,000 through trading and McDonald withdrew or transferred approximately $29,000 out of the account.  On February 27, 2018, McDonald withdrew the balance of the account, or approximately $79,213, transferred the funds to his corporate bank account at Regions Bank, and ceased trading.

19.     Although McDonald did not hold or trade the investor funds in segregated accounts, and instead appeared to have commingled the funds with each other, based on the review of his trading accounts at GAIN Capital, it appears that none of his accounts suffered a "full loss" as McDonald told Customer A and Customer C.  Instead, the Commission has discovered evidence that McDonald transferred a portion of investor funds from GAIN Capital to an account in his name at Gemini Trust Company LLC, a domestic cryptocurrency exchange, and also to an offshore foreign currency trading firm.

---

[1]  There was minimal trading activity in the second trading account in McDonald's name.

20.     Based on the foregoing, the Commission is investigating whether McDonald engaged or is engaging in, among other things, the fraudulent solicitation of funds to trade forex, the misappropriation and commingling of customer funds, and the issuance of false statements relating to his purported trading, in violation of the Act and the Regulations, specifically Sections 4b(a)(2)(A)-(C) and 6o(1)(A) and (B) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6o(1)(A) and (B) (2012), and Regulations 4.20(c) and 5.3(a)(3)(i),17 C.F.R. §§ 4.20(c) and 5.3(a)(3)(i) (2018).

21.     The Commission's investigation has revealed that McDonald held bank accounts in his name at Citibank and JPMorgan Chase Bank, N.A. ("JPMorgan") during the Relevant Period.  As part of its investigation, the Commission seeks to serve investigative Subpoenas on Citibank and JPMorgan for McDonald's bank records.

ARGUMENT

The Court Should Grant The Commission's Application<br>To Delay Notice Of Its Investigative Subpoenas

22.     Under the RFPA, the Commission generally may not have access to or obtain copies of or information contained in the financial records of any customer from a financial institution unless the customer has authorized such disclosure or "such financial records are disclosed in response to an administrative subpoena or summons which meets the requirements of section 3405 [of the RFPA]."  12 U.S.C. § 3402(2) (2012).

23.     Section 3405 of the RFPA generally requires, among other things, that if the Commission were to issue an investigative subpoena to a financial institution for a customer's personal financial records, the Commission would be required to notify that customer of the subpoena and wait fourteen days before obtaining any records in order to afford the customer an opportunity to quash the subpoena.  *See* 12 U.S.C. §§ 3405 and 3410(a) (2012).

24. The RFPA, however, recognizes that notice of and an opportunity to move to quash an investigative subpoena for financial records may interfere with the government's legitimate investigative goals. Accordingly, Section 3409 of the RFPA provides a special procedure under which a government authority may obtain records pursuant to a subpoena while delaying notice of the subpoena to the individual for up to ninety days. *See* 12 U.S.C. § 3409(a) (2012).

25. Specifically, the RFPA provides that, upon application "made with reasonable specificity," this Court shall issue an *ex parte* order delaying customer notice of the Commission's investigative subpoenas for a period not to exceed ninety days if the Court finds that:

> (1) the investigation being conducted is within the lawful jurisdiction of the Government authority seeking the financial records;
>
> (2) there is reason to believe that the records being sought are relevant to a legitimate law enforcement inquiry; and
>
> (3) there is reason to believe that such notice will result in—
>
> (A) endangering life or physical safety of any person;
>
> (B) flight from prosecution;
>
> (C) destruction of or tampering with evidence;
>
> (D) intimidation of potential witnesses; or
>
> (E) otherwise seriously jeopardizing an investigation or official proceeding or unduly delaying a trial or ongoing official proceeding to the same extent as the circumstances in the preceding subparagraphs.

12 U.S.C. § 3409(a) (2012). Each of these requirements is satisfied here.

26.     First, the Commission possesses jurisdiction to conduct this investigation.  The

Commission has broad jurisdiction to conduct investigations "to ascertain the facts regarding the

operations of . . . persons subject to the provisions of this chapter."  7 U.S.C. § 12(a)(1) (2012).

The Division of Enforcement (the "Division"), on behalf of the Commission, has authority to

conduct investigations "to determine whether any persons have violated, are violating, or are

about to violate the provisions of [the Act], or the rules, regulations or orders adopted by the

Commission pursuant to th[e] Act . . . ."  17 C.F.R. § 11.2(a) (2018).  Further, the Division may

issue subpoenas pursuant to its investigations "when authorized by order of the Commission."

*Id.*

27.     Here, the Commission has delegated authority to the Division to investigate

futures and forex trading fraud generally and McDonald's trading specifically.  The Division is

investigating whether McDonald engaged or is engaging in, among other things, fraud, the

misappropriation and mishandling of client funds, and the issuance of false statements relating to

his forex trading, all in violation of certain provisions of the Act and Regulations.  Accordingly,

this investigation is well within the Commission's jurisdiction.  *See* 7 U.S.C.

§ 2(c)(2)(C) (2012); *CFTC v. EJS Capital Mgmt. LLC,* No. 14 CV 3107 (CM), 2015 WL

13359358 at *6 (S.D.N.Y. Dec. 18, 2015) (finding that CFTC possesses jurisdiction over forex

solicitation and transactions pursuant to Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C)

(2012)).

28.     Second, the financial records that the Commission seeks are relevant to a

legitimate law enforcement investigation.  The Commission's investigation seeks to determine

whether McDonald has violated the law by committing fraud relating to his forex trading

activities.  The financial records sought by the subpoena may:  (a) identify any additional

investors and the total amount of investor funds; (b) reveal whether investor funds were actually used to invest in forex or were misappropriated; (c) identify any banks, FCMs, or other financial institutions to which investor funds were transferred; (d) identify other individuals who may have participated in McDonald's fraudulent scheme or were beneficiaries of any misappropriation; and (e) indicate whether McDonald improperly commingled client funds or otherwise mishandled those funds. Thus, there is reason to believe that McDonald's financial records are relevant to this investigation.

29.     Third, there is reason to believe that the required notice under the RFPA would result in McDonald's flight from prosecution or the destruction of or tampering with evidence. Presently, the Commission has not notified McDonald of its investigation into his trading. Upon learning of this investigation, McDonald will have the opportunity to flee to another jurisdiction, or destroy or tamper with books and records and any other documents evidencing fraud. There is reason to believe that McDonald has already fled from California in order to evade Customer A and being served in Customer A's civil suit against him. Providing McDonald with notice of the Commission's investigation may cause him to flee again, possibly out of the country.

30.     Providing McDonald with notice of the Commission's investigation would also afford McDonald time to disperse and secrete misappropriated funds. The GAIN Capital trading records show that McDonald has withdrawn all funds remaining in both his corporate and his personal trading accounts. The Commission has uncovered evidence that McDonald has transferred at least some of these funds to Gemini and to an offshore forex trading firm. Upon learning of the Commission's investigation, McDonald would have further opportunity and motive to remove these funds from the country to offshore accounts. He would also have the

10

opportunity to transfer funds to other domestic accounts, to hide the funds in the form of cash or bearer bonds, or otherwise dissipate investor monies.

31.     Further, there is reason to believe that the required notice under the RFPA will otherwise seriously jeopardize the Commission's investigation.  The Act recognizes the risk that an individual engaging in fraud will take steps to destroy or tamper with evidence, and it offers a remedy.  Under Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), at the same time Commission files an enforcement action it may obtain an *ex parte* restraining order freezing assets and prohibiting the defendant or other individuals from destroying, altering, or disposing of books, records, and other documents.  Providing McDonald with notice of the Commission's subpoenas for his financial records may result not only in the destruction and tampering of evidence but also in the dissipation of client funds, thus rendering moot any *ex parte* restraining order that the Commission would otherwise seek from the Court.

## CONCLUSION

WHEREFORE, the Commission respectfully requests that the Court grant this application for an *ex parte* order delaying customer notice under the RFPA for a period of ninety days for the reasons stated above.  A proposed Order is being submitted herewith.

Respectfully submitted,

Dated:  August 1, 2018

GRETA G. GAO
D.C. Bar No. 999182
CHRISTINE RYALL
Florida Bar No. 0983550
Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581

Telephone:  (202) 418-5000
ggao@cftc.gov
cryall@cftc.gov